UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
(electronically filed)

**UNITED STATES OF AMERICA**                                                  **PLAINTIFF**

**v.**                                                   **CRIMINAL ACTION NO. 3:22-CR-105-CRS**

**LA'QUEL MCCRARY**                                                 **DEFENDANT**

---

## MOTION TO SUPPRESS

Comes the defendant, La'Quel McCrary, through counsel, and moves this Honorable Court to suppress all evidence obtained and statements made as a result of the seizure and search of Mr. McCrary and his vehicle on September 29, 2021. In support of this motion, Mr. McCrary states the following:

LMPD Officer David Bassler conducted a traffic stop of Mr. McCrary for excessive speed. According to the body cam, when the officer approached McCrary, he asked why he was going so fast. McCrary explained that he was going home to get the car seat to bring his girl and their new baby home from the hospital. He showed the officer his hospital ID bracelet. The officer then asked for the paperwork for the car and looked at a photo of Mr. McCrary's license on his phone. After obtaining all this information relevant to the traffic stop, the officer asked him the following questions:

- "Is there anything illegal in the car,"
- "Are there any guns,"
- "You don't have any guns,"
- "What were you putting in the passenger seat as you were pulling over?

In response to Mr. McCrary's explanation, the officer explained that the officer wasn't the "dope boys" and he wasn't the "jump out boys", and that Mr. McCrary should not treat him like it's his first day or that he's an idiot. Then, more questions:

- "Any chance you have warrants,"
- "Have you ever been in trouble before,"
- "What were you in trouble for,"
- "Is there a gun in the car now?"

The officer then claimed, "There's nothing illegal about having a gun, I just like honesty." He then asked again, for the fifth time, "Is there a gun in the car now?"

This questioning about the firearm was an unlawful extension of the traffic stop for excessive speed, and the questions were clearly meant to elicit incriminating responses. Mr. McCrary was not told that he did not have to answer the question, and in fact, he was badgered by being asked the same question five times. Mr. McCrary was not told that he had a right to a lawyer, and he was given incorrect legal advice by the officer to convince him to answer the question. After Mr. McCrary admitted that he had a prior gun charge, the officer asked if he had a gun now, assured him there was nothing illegal about having a gun, and then asked him again whether he had a gun. With that inaccurate reassurance, Mr. McCrary's will was overborn and he admitted there was a gun in the car. Once that admission had been made, the officer informed Mr. McCrary that he was going to open the glove box and seize the gun, which he did. He then told Mr. McCreary to get out of the vehicle so that he could search it. He told Mr. McCreary, "I'm gonna search the car. You know I don't need permission, based on everything." (Body cam at 32:54).

Statements:

The statements made by Mr. McCrary are subject to suppression since Mr. McCrary was interrogated without the benefit of being informed of his rights. Mr. McCrary was badgered with questions unrelated to the purpose of the traffic stop in a situation where he did not feel free to leave. The Sixth Circuit has provided guidance for determining when a traffic stop has transformed into a custodial interrogation.

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

In the case at bar, the purpose of the questioning was to issue a ticket for excessive speed. "We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015) (internal quotation marks omitted). Badgering about whether there was a gun in the car was *not* part of the traffic infraction investigation and delayed the officer from diligently pursuing the purpose of the stop. "A seizure for a traffic violation justifies a police investigation *of that violation*." *Id*. at 354 (emphasis added).

In addition, the officer asked Mr. McCrary whether he had ever been in trouble before. There was no purpose for this question other than to elicit an incriminating response. Asking this question before advising Mr. McCrary of his rights was a violation of Mr. McCrary's Fifth Amendment rights. "[A]sking a suspect whether he had a criminal record and owned or possessed a firearm certainly amounts to express questioning that police should know is reasonably likely to evoke an incriminating response." *United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) (internal citation and quotation marks omitted). This question was asked solely for the purpose of obtaining an incriminating response from Mr. McCrary.

The place of questioning, the left shoulder of a busy multi-lane freeway, was not more coercive than a typical traffic stop. However, in the United States in 2021, any young black male stopped by an armed police officer could reasonably feel that the situation is tense and potentially dangerous. This officer in fact repeatedly said to him things such as, "don't treat me like an idiot", "I'm not mad," "everything's fine," and "don't give me a reason to flip the script." These statements all indicate a tense situation where the officer could become "mad" and "flip the script" at any point in the interaction. The officer's demeanor and tone made clear that non-compliance or failure to give the answer the officer was seeking (not about the excessive speed) was not an option.

The length of this traffic stop was excessive. Mr. McCrary finally received his citation at one hour and ten minutes into the stop. This stop was prolonged way beyond the time necessary to complete the purpose of the stop. This officer did not extend the stop to summon a drug dog, but instead prolonged the stop to summon detectives. While checking on the gun he had retrieved, he made a call to a detective that told him, "we are working a case on McCrary," at which point the officer took the call off speaker-phone and finished with, "Ok, I'll see you when

4

you get here, and we'll figure something out from there." He did not extend the stop for a drug dog, but instead for the drug police (after having assured Mr. McCrary that he was not the drug police).

Mr. McCrary did not have unrestrained freedom of movement. He was not allowed to sit in his car while waiting for the citation. He was not allowed to retrieve possessions from the vehicle. He was told he could not leave on foot. He was made to sit on the cement barrier between two high-speed freeway lanes. He was never told he did not have to answer questions, instead he was badgered about questions irrelevant to the purpose of the stop.

The factors in this case show that Mr. McCrary was in custody while being investigated for criminal activity. The officer made a point of saying to the detectives who came to search the car that, although Mr. McCrary was not free to leave, he was not in custody, so they could use his answers about the gun. This was a deliberate ploy to avoid instructing on Miranda rights. The fact is that Mr. McCrary was not free to leave, and he was being investigated for criminal activity beyond the traffic infraction. Deliberately avoiding Miranda while conducting a roadside criminal investigation should not be condoned by this Court.

Vehicle search:

For the purposes of the Fourth Amendment, a traffic stop constitutes a seizure of the driver and any passengers in a vehicle. *Brendlin v. California,* 551 U.S. 249, 257–58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); *United States v. Campbell,* 549 F.3d 364, 371 (6th Cir. 2008). During a lawful traffic stop, the Fourth Amendment protects the people from being subject to "unreasonable search and seizures." *Davis v. United States*, 564 U.S. 229, 131 S.Ct. 2419, 2423 (2011). Warrantless searches, as the officers here decided to conduct, are *per se* unreasonable unless the search falls into one of a few specifically established and well-delineated

exceptions to the warrant requirement. *Arizona v. Gant,* 556 U.S. 332, 338 (2009). The government has the burden to establish the exception justifying its search. If the government cannot satisfy this burden, the exclusionary rule bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation, as a deterrent to law enforcement. *Id.* In the case at bar, the officer alleged on body cam that he didn't need permission to search "based on everything." (body cam 32:54). The "everything" was the answers badgered out of Mr. McCrary to irrelevant questions. This was a non-consensual, warrantless search, that resulted from an unlawfully-prolonged traffic stop and an unlawfully-obtained incriminating statement.

**WHEREFORE** this Honorable Court is respectfully requested to enter the attached Order setting an evidentiary hearing date regarding the admissibility of the evidence obtained as a result of the traffic stop and warrantless search of Mr. McCrary's vehicle.

**Respectfully submitted,**

/s/   Rob Eggert
**ROB EGGERT**
600 West Main Street
Suite 200
Louisville, Kentucky 40202
(502) 540-5700

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 6, 2023, the foregoing notice was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all of the attorneys of record.

/s/   Rob Eggert
**ROB EGGERT**