**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:22-CR-00105-CRS**

UNITED STATES OF AMERICA                                                    PLAINTIFF

VS.

LA'QUEL MCCRARY                                                              DEFENDANT

## REPORT AND RECOMMENDATION

Defendant La'Quel McCrary ("McCrary") is charged with possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 992(g)(1) and 924(a)(2). (DN 1). McCrary has filed a motion to suppress evidence obtained and statements made in relation to the search and seizure of his vehicle on September 29, 2021. (DN 23). The government has responded in opposition to the motion. (DN 28). The District Judge has referred the motion to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation. (DN 30).

### I. Findings of Fact

On September 29, 2021, Louisville Metro Police Department ("LMPD") Officer David Bassler ("Officer Bassler") pulled La'Quel McCrary over for speeding. Bodycam footage from Officer Bassler captured the entirety of the stop. (*See* DN 28-1). His police cruiser's radar registered McCrary going as fast as ninety-six miles-per-hour in a fifty-five mile-per-hour zone. (*Id.*, at 1:25). When Officer Bassler requested McCrary's license and registration, McCrary presented him an envelope from the passenger sun visor. (*Id.*, at 1:20–1:25). He stated that he did not have his physical license but could locate a picture of it on his phone. (*Id.*, at 1:35). Officer Bassler allowed McCrary to look through his phone. (*Id.*).

1

While waiting on McCrary to search for the picture, Officer Bassler asked him a series of questions regarding if "there was anything illegal in the car," including "any guns." (*Id.*, at 1:40). McCrary responded in the negative. (*Id.*). Officer Bassler then questioned McCrary about movement he saw as he approached the car, stating that he saw McCrary leaning over into the passenger compartment. (*Id.*, at 2:02). McCrary first explained that he was moving a Playstation box from the passenger seat into the floorboard. (*Id.*, at 2:05). After Officer Bassler challenged that explanation, McCrary then stated that he was reaching over to grab the registration and insurance information from the glovebox. (*Id.*, at 2:10–2:30).

At that point, McCrary presented his phone to Officer Bassler with what appears to be a photograph of his license. (*Id.*, at 2:40). Still, Officer Bassler continued to ask him questions, including:

- Is there any chance you got warrants? (*Id.*, at 3:28).

- Have you ever been in trouble before? (*Id.*, at 3:30).

- For what? (*Id.*, at 3:35).

McCrary explained he had a gun charge when he was eighteen years old. (*Id.*, at 3:36). The questioning continued:

- Are you on paper? (*Id.*, at 3:42).

- What was the gun charge? Just had a concealed firearm or whatever? (*Id.*, at 3:46).

- You were a minor in possession of a gun? (*Id.*, at 3:52).

Although he had just stated he was eighteen at the time, McCrary suggested and then confirmed that he was previously charged as a minor in possession of a gun, and Officer Bassler continued the questioning:

2

- There's no guns in the car now? Here's the thing man, there is nothing illegal about having them.[1] I just like honesty. (*Id.*, at 3:55).

- Is there any guns in the car? (*Id.*, at 4:02).

Finally, McCrary admitted to Officer Bassler that there was a gun in the car. (*Id.*, at 4:05).

Officer Bassler then asked for information about the gun. (*Id.*, at 4:07–4:45).  McCrary explained that the gun belonged to his girlfriend, it was in the car's glove compartment, and reiterated that he did not have drugs in the car. (*Id.*). Eventually, Officer Bassler recorded the information from McCrary's phone showing a photo of his license. (*Id.*, at 5:05–5:19). Officer Bassler then went back to his police cruiser to check McCrary's license and registration information. (*Id.*, at 5:19).

After running McCrary's information through law enforcement databases, Officer Bassler discovered that McCrary's address on the database differed from his actual residential address. (*Id.*, at 6:49). He re-approached the car to ask about this discrepancy. (*Id.*). Officer Bassler repeatedly told McCrary that "everything [is] fine" and that he could continue talking to his girlfriend on the phone while he retrieved the gun from his car for examination. (*Id.*, at 7:11–8:30). Officer Bassler retrieved the gun, took it back to his car, and disassembled it. (*Id.*, at 8:25–9:40). The gun had been loaded. (*Id.*, at 8:30).

Officer Bassler then returned to his car, where he used his radio and cell phone to contact other law enforcement agents about the stop. (*Id.*, 8:40–23:00). While making these phone calls, Officer Bassler discovered from police databases that McCrary was not charged as a minor in possession of a gun as he had said; instead, he was convicted of a felony drug charge, making him prohibited from possessing a firearm. (*Id.*, at 19:38). While phoning another member of law

---

[1] Though McCrary is now charged as being a felon in possession, McCrary's misrepresentation about his criminal history, if true, would not have made him prohibited from carrying a firearm.

enforcement for advice on how to proceed with the stop, the other officer indicated that he is working on an investigation involving McCrary. (*Id.*, at 25:02). Officer Bassler then turned off speakerphone, so the remainder of the conversation was not fully captured by bodycam footage. (*Id.*, at 25:02–30:35).

Officer Bassler eventually got out of his car and told McCrary his car would be towed for lacking insurance coverage and not possessing his license. (*Id.*, at 31:05–31:15). Officer Bassler then asked him where he pulled the gun from to put it in the glove box. (*Id.*, at 31:25–31:30). McCrary confirmed that the gun was initially in the center console and acknowledged that he was prohibited from having a gun due to his conviction. (*Id.*, at 31:30–32:05). Officer Bassler then asked McCrary to get out of the car and gave him a brief pat-down search. (*Id.*, 32:21–32:55). Officer Bassler and McCrary discussed the logistics of impounding the car and getting McCrary picked up. (*Id.*, at 33:00–39:00). Officer Bassler repeatedly reiterated that McCrary was not going to jail. (*Id.*). During this time, Officer Bassler gave McCrary his water bottle from the car as well as a cigarette and lighter. (*Id.*, at 36:20–46:20).

At that point, the other officer arrived, and Officer Bassler explained to McCrary that nothing has changed, he is still not under arrest, and that the other officer was just here because the tow truck was coming. (*Id.,* at 46:09). Officer Bassler then went to his car to complete the citation and towing paperwork while the second officer went to talk to McCrary. (*Id.,* at 47:26–53:30).

Officer Bassler then re-approached the car to conduct a search. (*Id.,* at 53:30–57:22). At McCrary's request, Officer Bassler retrieved a large amount of cash from the center console and placed it inside of a playstation box and moved the box to the trunk. (*Id.*, at 57:22–1:01:15). Bassler returned to his car to finalize the citation. (*Id.*, at 1:02:25–1:09:35). The bodycam footage ends

4

after Officer Bassler gave McCrary the citation, explained his court date, and allowed McCrary to leave with the people he had called to pick him up. (*Id.*, at 1:09:40–1:10:50).

On April 19, 2023, the Court held a hearing on this Motion to Suppress. (DN 36). Officer Bassler provided testimony at the hearing, walking through the bodycam footage. (*See* DN 38). Following the hearing, the parties filed supplemental briefing. (DN 40; DN 41).

## II. Conclusions of Law

McCrary seeks to suppress evidence from this traffic stop on numerous grounds. First, he challenges the justification for the initial traffic stop. Next, he argues that his seizure exceeded the scope of a normal *Terry* stop due to the questioning and the stop's length of time. Lastly, he challenges Officer Bassler's search of the car as being unconstitutional.

- Was the initial stop permissible?

The Court will first assess McCrary's argument regarding the constitutionality of the initial stop. The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–11 (1996). While the Fourth Amendment's unreasonable prohibition applies to traffic stops, they are generally "reasonable where the police have probable cause to believe that a traffic violation occurred." *Id.* at 809.

McCrary asserts that Officer Bassler should have never pulled McCrary over as he lacked "probable cause to believe the radar was detecting Mr. McCrary's speed" and not that of another passing vehicle. (DN 40, at PageID # 187–188). While McCrary correctly points out that the police cruiser's technology "does not indicate which speed on the display is associated with which

vehicle," Officer Bassler still could visually determine the relative speed of the cars around him. (*See id.*, at PageID # 187). His testimony at the hearing bears this out, as he stated that "[t]here were other vehicles [traveling] at highway speeds but none as quick as [McCrary], because he was passing them." (DN 38, at PageID # 141). Officer Bassler's police cruiser radar detected a car traveling as fast as 96 miles-per-hour, though the radar "locked in" a speed of 86 miles-per-hour. (*Id.*, at 110). Both speeds are well above the posted 55 mile-per-hour speed limit. Because the radar detected a car traveling at violative speeds and Officer Bassler watched McCrary's vehicle pass the other vehicles, Officer Bassler had probable cause to commence the traffic stop.

- <u>Did Officer Bassler exceed the permissible scope of the seizure?</u>

McCrary also asserts that both the length of the stop as well as Officer Bassler's questioning transformed it into an unconstitutional seizure. (DN 40, at PageID # 188).  The Supreme Court has analogized ordinary traffic stops to *Terry* stops. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see Terry v. Ohio*, 392 U.S. 1 (1968). The Fourth Amendment's reasonableness mandate extends beyond just the initial reason for the stop. *See United States v. Palomino*, 100 F.3d 466, 449 (6th Cir. 1996). Thus, courts must analyze the reasonableness of the detention in its entirety to determine "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). Such seizures may "last no longer than is necessary to effectuate the purpose" for initiating the stop. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.

However, inquiries into matters unrelated to the justification for the traffic stop "do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Further, if "something happen[s] *during the stop* to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot'" then the stop may be extended for that purpose. *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005).

McCrary asserts that Officer Bassler obtained all the necessary information to issue a traffic citation within six minutes and thirty-five seconds of the stop, yet the stop lasted much longer. (DN 40, at PageID # 188). He claims that this prolonging of the stop violated his Fourth Amendment right.

After commencing the stop, Officer Bassler promptly requested the standard documentation for issuing a citation. Because McCrary did not have his driver's license, Officer Bassler had to wait for him to search his phone for a picture of the license. While waiting, Officer Bassler began asking about his movement in the passenger area while pulling over. At the hearing, Officer Bassler testified he was concerned about this movement "based on the experiences that [he has] had as a police officer as well as training that those types of movement are consistent with trying to hide or conceal contraband or anything that [motorists] don't want law enforcement to be aware of." (DN 38, at PageID # 112)

Officer Bassler immediately recognized that McCrary was not being truthful to him. First, McCrary told him that he was moving a box in his passenger seat to the floorboard. When Officer Bassler knew this was not true, McCrary changed his story and said that he was retrieving the registration papers from the glove compartment. Though Officer Bassler did not press him further on this revised explanation during the stop, he stated at the hearing that he knew McCrary removed

the files from the passenger sun visor after Officer Bassler approached the vehicle. (*Id.*, at PageID # 113). The body camera footage also shows McCrary pulling the envelope from the visor after Officer Bassler already approached the vehicle. (*See* DN 28-1, at 1:20–1:25)

Clued into the fact that McCrary may be hiding something, Officer Bassler briefly continued this line of questioning after McCrary offered him the photo of his license. Soon thereafter, McCrary admitted to having a criminal record—though he again lied about the nature of his conviction—and then confessed to having a firearm.

At the suppression hearing, Officer Bassler testified that some traffic stops can take as little as seven to ten minutes when the driver has all required documentation. (DN 38, at PageID # 150, 170–71). In this case, McCrary lacked copies of both his license and insurance information. Still, within four minutes of Officer Bassler approaching McCrary's vehicle, he learned about the gun in the car and McCrary's criminal history, broadening the scope of the stop beyond a normal traffic investigation. The Court finds that McCrary's suspicious movement coupled with his numerous, inconsistent, and inadequate explanations for that movement provided reasonable suspicion for Officer Bassler to further investigate if criminal activity was afoot. Because the parameters of the stop quickly expanded, Officer Bassler did not unlawfully extend an otherwise lawful traffic stop.

McCrary next asserts that the stop amounted to a custodial interrogation due to questioning such as "Is there anything illegal in the car?" (DN 40, at PageID # 188). He states that this type of questioning without first being mirandized violated his Fifth Amendment rights. (*Id.*). The Fifth Amendment protects individuals from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To ensure that persons are accorded this right, the Supreme Court has held that individuals subject to a custodial interrogation must first be given notice of the right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966). Therefore,

8

the Court must determine if this routine traffic stop transformed into an in-custody interrogation where McCrary should have been read his rights.

A traffic stop can become a custodial interrogation "when the actions of police officers lead a reasonable person to believe that they are not free to leave." *Id.* (citing *United States v. Mendenhall*, 446 U.S. 554, 554 (1980)). Two features of a traffic stop generally mitigate the danger of the motorist speaking when he would not otherwise freely do so. *See id.* at 437 (quoting *Miranda*, 384 U.S. at 467). First, traffic stops last for only a "presumptively temporary and brief" amount of time. *Id.* Though courts have never prescribed a definitive amount of time, the stop should only last long enough for the officer to "check[ ] the driver's license, determine[ ] whether there are outstanding warrants against the driver, and inspect[ ] the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). Second, "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Berkemer*, 468 U.S. at 438. Courts consider factors such as:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police ... [or] acquiesced to their requests to answer some questions.

*United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

McCrary claims that Officer Bassler's questioning "cannot be seen as anything other than an attempt to compel a person to be a witness against himself." (DN 40, at PageID # 188). As such, McCrary argues, he must have been given notice of his rights against self-incrimination under *Miranda* and the Fifth Amendment. (*Id.*).

In full the traffic stop lasted over an hour. However, the questioning that McCrary now challenges occurred mere minutes into the stop and while waiting for McCrary to find his license information. Thus, just prior to McCrary disclosing that there was a gun in the car and that he had a criminal record, the stop was still on track to be temporary and brief. As such, the time element cuts against the questioning being part of an in-custody interrogation.

Further, the general circumstances around the stop also fail to indicate Bassler should have mirandized McCrary. First, Officer Bassler's training and experience as an officer supported the questioning, as he spotted suspicious movement before approaching the car and McCrary repeatedly changed his explanation for the movement. Second, the questioning was not hostile or coercive as it occurred on the side of the highway, in the middle of the day, with many cars driving by throughout the encounter. Third, as explained above, the length of the questioning McCrary challenges was short and completed within the first few minutes of the stop. Lastly, there no other indicia of custody: McCrary stayed in his car throughout the challenged questioning; he was never placed in handcuffs; Officer Bassler repeatedly told him that he was not going to jail; Officer Bassler was the lone law enforcement official during the challenged questioning; and Officer Bassler was polite and courteous throughout the stop. The Court finds that between the short amount of time before McCrary disclosed his gun and the general circumstances around the stop, it did not exceed the bounds of *Terry* and transform into a custodial interrogation. As such, Officer Bassler did not violate his Fifth Amendment rights.

- <u>Did Officer Bassler improperly search the car when he retrieved the pistol?</u>

McCrary next asserts that Officer Bassler "performed a nonconsensual, warrantless search when he opened the car door to retrieve the gun from the glovebox—without even determining that the gun was not lawfully in the vehicle." (DN 40, at PageID # 189).

10

While the Fourth Amendment reasonableness requirement demands officers efficiently handle traffic stops, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. As such, officers may "conduct an area search of the passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long*, 463 U.S. 1032, 1051 (1983).

Here, Officer Bassler knew that McCrary hid a gun in the glove compartment when he opened it. McCrary had finally admitted to putting a gun there after fabricating two other justifications for his movement. And although Officer Bassler may not have known at the time that McCrary was prohibited from carrying a firearm, he did know of McCrary's criminal history. Officer Bassler said during the stop that he was going to remove the gun to "make sure everything is on the up-and-up" and for "safety." (DN 28-1, at 7:35–7:50). At the hearing, he reiterated that he removed the firearm "for [his] safety as well as [McCrary's] safety" as he "just tr[ies] to mitigate any issues from arising for something so simplistic as securing [firearms.]" (DN 38, at PageID # 116, 117). Despite not knowing at the time that McCrary was prohibited from carrying a firearm, Officer Bassler possessed reasonable suspicion that criminal activity was afoot based on McCrary's suspicious movement and his repeated lies. As such, he was justified in removing the firearm for his safety.

- <u>Was Officer Bassler justified in impounding the McCrary's vehicle?</u>

Lastly, McCrary claims that his car should not have been towed and argues that doing so was "egregious behavior by [the LMPD]."[2] In support of that assertion, McCrary cites a Kentucky

---

[2] McCrary cites the recent Department of Justice investigation into the LMPD which found that the department "disproportionately searches, detains, cites, and arrests Black residents." (DN 40, at PageID # 190 (citing USDOJ, *Investigation of the Louisville Metro Police Department and Louisville Metro Government*, p. 35)). Though the report highlights a pattern of striking behavior, the Court finds that the report is not conclusory to the issues

Supreme Court case which states, in dicta in a footnote, that it could not find the police's authority "for towing a vehicle based on the failure to produce insurance" when police did not arrest the driver. *See Epps v. Kentucky*, 295 S.W.3d 807, 808 n.1 (Ky. 2009) (*overruled on other grounds by Davis v. Kentucky*, 484 S.W.3d 288 (Ky. 2016)).

The instant case sufficiently differs from *Epps*. Here, McCrary lacked not only proof of insurance, but he also lacked his license, the license address he gave to Officer Bassler differed from the listed address in the police database, and his registration was expired. Taken together, Officer Bassler was justified in towing the car. *See Bybee v. City of Paducah*, 46 Fed. App'x 735, 737 (6th Cir. 2002) (holding an officer was justified in towing a car that lacked registration and insurance as a matter of public safety).

## IV. Recommendation

**IT IS THEREFORE RECOMMENDED** that McCrary's Motion to Suppress (DN 23) be **DENIED**.[3]

Regina S. Edwards, Magistrate Judge
United States District Court

June 21, 2023

---

involved in this case.

[3] In their briefs, both parties also present arguments involving the inevitable discovery doctrine. (*See* DN 40, at PageID # 190–91; DN 41, at PageID # 199–200). Because the Court recommends a finding that the traffic stop never violated McCrary's constitutional rights, it need not assess the merits of these arguments.

## NOTICE

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. Fed. R. Crim. P. 59(b)(2). If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 474 U.S. 140, 150–51, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985).

Copies:          Counsel of Record

13