UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**UNITED STATES OF AMERICA**                                                                 **PLAINTIFF**

**vs.**                                                                          **CRIMINAL ACTION NO. 3:22-CR-105-CRS**

**LA'QUEL MCCRARY**                                                                 **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court for consideration of the motion of Defendant La'Quel McCrary to suppress evidence. DN 23. McCrary seeks suppression of evidence seized and statements made during the stop of a vehicle he was operating on September 29, 2021. The motion was referred to the United States Magistrate Judge for an evidentiary hearing and for findings of fact, conclusions of law, and a recommendation concerning disposition of the motion. The Magistrate Judge held a hearing and the parties filed supplemental briefs with citations to the record. The Magistrate Judge issued a Report and Recommendation (DN 46) to which McCrary has filed objections (DN 51). The United States has not filed a response to those objections. The motion is now ripe for decision by this Court.

The Magistrate Judge issued a thorough recitation of facts and well-reasoned conclusions of law. For continuity and accuracy, the Court will restate pertinent facts and will make a number of corrections to the Magistrate Judge's Findings of Fact. The entire vehicle stop in issue was recorded on Louisville Metro Police Department ("LMPD") Officer David Bassler's bodycam. DN 28-1. The events themselves are not in dispute. Rather, it is the conclusions drawn by the Magistrate Judge from that series of events to which McCrary objects. Suffice it to

say that what began on September 29, 2021 as a routine vehicle stop for speeding on the Watterson Expressway developed into an hour-long stop which involved seizure of a firearm from the vehicle and a decision by law enforcement to have the vehicle towed.  A citation was issued for the driver's failure to produce a driver's license and proof of insurance, and for an expired vehicle registration.  McCrary, the driver, was permitted to leave the scene of the stop after the citation was issued to him.

I.     **Findings of Fact**[1]

On September 29, 2021, Officer Bassler pulled McCrary over for speeding.[2] Radar had registered McCrary going as fast as 96 miles per hour in a 55 miles per hour zone. (*Id.*, at 1:25). When Officer Bassler asked McCrary for his license and registration, McCrary presented him an envelope he retrieved from the passenger side sun visor. (*Id.*, at 1:20–1:25). He stated that he did not have his physical license but could locate a picture of it on his phone. (*Id.*, at 1:35). Officer Bassler allowed McCrary to look through his phone. (*Id.*).

While waiting on McCrary to search for the picture, Officer Bassler asked McCrary whether "there was anything illegal in the car" and whether there were "any guns." (*Id.* at 1:40). McCrary responded "No, sir." (*Id.*). Officer Bassler then questioned McCrary about movement Bassler had observed, stating that he saw McCrary leaning over into the passenger area as he was stopping the vehicle. (*Id.* at 2:02). McCrary first explained that he was moving a PlayStation box from the passenger seat onto the floorboard. (*Id.* at 2:05). After Officer

---

[1] These facts are taken from the Magistrate Judge's Report, DN 46, pp. 1-5 and the bodycam footage, DN 28-1.
[2] In the opening paragraph the Magistrate Judge stated that McCrary seeks suppression of evidence seized from "his vehicle."  McCrary was operating the vehicle which was stopped but has asserted it belonged to his girlfriend.  The Court will change "his" to "a" for accuracy.

Bassler challenged that explanation, McCrary stated that he was reaching over to retrieve the registration and insurance information from the glove compartment. (*Id.* at 2:10–2:30). McCrary can be seen on the bodycam video reaching up to the passenger side sun visor to retrieve the envelope of documents. (*Id.* at 1:20-1:25).

At that point, McCrary presented his phone to Officer Bassler with what appeared to be a photograph of his license. (*Id.* at 2:40). The following exchange between Bassler and McCrary took place:

> Bassler: "Is there any chance you got warrants?" (*Id.* at 3:28).
> McCrary: "No, sir." (*Id.* at 3:29).
>
> Bassler: "Have you ever been in trouble before?" (*Id.* at 3:30).
> McCrary: "Previous." (*Id.* at 3:31).
>
> Bassler: "For what?" (*Id.*, at 3:35).
> McCrary: "Gun charge…uh…It was when I was 18." (*Id.* at 3:36).
>
> Bassler: "Are you on paper?" (*Id.* at 3:42).
> McCrary: "No, sir." (*Id.* at 3:43).
>
> Bassler: "What was the gun charge? Just had a concealed firearm or whatever?" (*Id.* at 3:46).
> McCrary: "It was…uh…uh…minor." (*Id.* at 3:47).
>
> Bassler: "You were a minor in possession of a gun?" (*Id.* at 3:52).
> McCrary: "Yes, sir." (*Id.* at 3:53).
>
> Bassler: "And there's no guns in the car now. Here's the thing man, there is nothing illegal about having them.[1]  (*Id.* at 3:56).
> McCrary: "Yes, sir." (*Id.* at 3:59).
>
> Bassler: "I just like honesty." (*Id.* at 3:59).
> McCrary: "Yes, sir." (*Id.* at 4:00)
>
> Bassler: "Is there any guns in the car?" (*Id.* at 4:03).

3

      McCrary: "Yes, sir." (*Id.* at 4:04).[3]

  Officer Bassler then asked for information about the gun. (*Id.*, at 4:07–4:45). McCrary explained that the gun in the vehicle's glove compartment belonged to his girlfriend. (*Id.*). Bassler wrote down the information from the picture of the license on McCrary's phone. (*Id.*, at 5:05–5:19). He then went back to his police cruiser to check the license and registration information. (*Id.*, at 5:19).

  After running McCrary's information through law enforcement databases, Officer Bassler discovered that McCrary's address in the database differed from his stated residential address. (*Id.*, at 6:49). He approached the vehicle a second time to ask about this discrepancy. (*Id.*). Officer Bassler assured McCrary that "everything [is] fine" and that he could continue talking to his girlfriend on the phone while Bassler retrieved the gun from the glove compartment for examination. (*Id.*, at 7:11–8:30). He retrieved the gun and took it back to his cruiser. (*Id.*, at 8:25–9:40).

  Officer Bassler contacted other law enforcement agents by radio and cell phone about the stop. (*Id.*, 8:40–23:00). While making these calls, he discovered from police databases that McCrary had not been charged as a minor in possession of a gun. Instead, McCrary had been convicted of a felony drug charge and thus was prohibited from possessing a firearm. (*Id.*, at 19:38). While phoning another member of law enforcement for advice on how to proceed with the stop, the other officer indicated that there was a working investigation involving McCrary. (*Id.*, at 25:02). Officer Bassler then turned off the speakerphone and the remainder

---

[3] At the end of the first full paragraph on page 8 of the Report in the Conclusions of Law section the Magistrate Judge stated that McCrary "confessed to having a firearm." This is a misstatement of the record. McCrary stated that there was a firearm in the vehicle in the glove compartment. He did not "confess" to "having" a firearm. The language will be changed to accurately reflect McCrary's statement.

4

of the conversation was not fully captured on bodycam footage. (*Id.*, at 25:02–30:35).

Officer Bassler approached the vehicle for a third time and told McCrary the vehicle would be towed as there was no proof of insurance coverage and because McCrary did not possess a license. (*Id.*, at 31:05–31:15). Officer Bassler then asked McCrary where the gun was when he moved it to the glove box. (*Id.*, at 31:25–31:30). McCrary indicated that the gun was initially in the center console and acknowledged that he was prohibited from having a gun due to his felony conviction. (*Id.*, at 31:30–32:05).[4] Officer Bassler then told McCrary to get out of the vehicle and gave him a brief pat-down search. (*Id.*, 32:21–32:55). Officer Bassler and McCrary discussed the logistics of impounding the car and having McCrary arrange to be picked up. (*Id.*, at 33:00–39:00). Officer Bassler told that McCrary that he was not going to jail. (*Id.*). Officer Bassler handed McCrary a water bottle and cigarette lighter retrieved from the vehicle. (*Id.*, at 36:20–46:20).

At that point, another police officer arrived. Officer Bassler explained to McCrary that "nothing ha[d] changed," that McCrary was not under arrest, and that the other officer was there because the tow truck was coming. (*Id.,* at 46:09). Officer Bassler then went to his cruiser to complete the citation and towing paperwork while the second officer talked to McCrary. (*Id.,* at 47:26– 53:30).

Officer Bassler conducted a search of the vehicle. (*Id.,* at 53:30–57:22). At McCrary's request, Officer Bassler retrieved a large amount of cash from the center console and placed it inside of the PlayStation box and moved the box from the passenger compartment of the vehicle to the

---

[4] In the first and second lines of the second paragraph on page 11 in the Conclusions of Law section, the Magistrate Judge stated that Officer Bassler "knew" that McCrary hid a firearm in the glove compartment as he "had finally admitted to putting a gun there." This is an inaccurate statement. Bassler "believed" that McCrary hid a firearm. Bassler observed suspicious movement, but he did not actually see McCrary touch or move a gun. McCrary did not "admit to putting the gun [in the glove compartment]." Rather, he admitted that there was a gun in the vehicle and that it was in the glove compartment. The Court will correct these inaccuracies.

trunk. (*Id.*, at 57:22–1:01:15). The bodycam footage ends after Officer Bassler gave McCrary the citation, explained his court date, and allowed McCrary to leave. (*Id.*, at 1:09:40–1:10:50).

## II.     Conclusions of Law

### A.  The Stop

McCrary challenged the validity of the initial stop. The Magistrate Judge found the stop valid as Officer Bassler testified to observing the vehicle operated by McCrary traveling at a high rate of speed and passing other vehicles. Officer Bassler's observation coupled with bodycam video showing the cruiser radar "locked in" at a speed of 86 miles per hour[5] provided probable cause to believe a traffic violation had occurred.

McCrary urged that the stop was improper because Bassler's radar could not discern which of the many cars on the highway was the one speeding. We agree with the Magistrate Judge, however, that the radar-detected speed and Officer Bassler's visual observation of the vehicle were sufficient to identify the vehicle driven by McCrary as the speeding vehicle. The objection on this point is overruled.

### B.  The Duration of the Stop

McCrary contended that the length of the stop and the questions posed by Officer Bassler transformed the stop into an unconstitutional seizure. The Magistrate Judge found the period of time McCrary was detained and the initial questioning of him reasonable in light of the entirety of the circumstances. The Report focused on the information developed by Bassler during the

---

[5] Officer Bassler testified that the radar clocked the vehicle at a maximum speed of 96 miles per hour but the speed "locked in" for purposes of the stop was 86 miles per hour. The posted speed limit on this stretch of highway was 55 miles per hour.

6

stop. First, as McCrary was pulling his vehicle to the side of the highway, Officer Bassler observed McCrary "dip" or lean over in the vehicle compartment. Officer Bassler was alerted by this behavior to the possibility that the driver, as yet unidentified, was trying to "hide or conceal contraband or anything that [motorists] don't want law enforcement to be aware of." (DN 38, PageID # 112). Next, in the first approximately six minutes of the stop Bassler sought to identify the driver and obtain a driver's license, vehicle registration and proof of insurance. McCrary was unable to satisfactorily provide these items. Indeed, a portion of the six minutes was consumed with McCrary searching his phone to locate a photo of his license. Additionally, Officer Bassler inquired about the movement he had observed in the vehicle to which McCrary gave two different untruthful explanations concerning his actions. This further heightened Officer Bassler's suspicion that criminal activity was afoot. He then asked whether McCrary had ever been in trouble and McCrary told him he had a prior gun charge. Officer Bassler again sought to confirm that there was no gun in the vehicle, telling McCrary he "liked honesty" and that there was "nothing illegal about having them." Officer Bassler testified at the suppression hearing that had McCrary been charged as a minor, he would not have been prohibited from possessing a firearm. Bassler believed at the time that McCrary had been charged as a minor.

The Magistrate Judge found that the officer had reasonable suspicion to inquire about weapons in the vehicle based upon his observation of McCrary's behavior while stopping the vehicle and McCrary's problematic explanation of his conduct. The Magistrate Judge further found that there was nothing about the nature or duration of the interaction between Officer Bassler and McCrary to that point to require a *Miranda* warning before McCrary was asked whether there was "anything illegal" or "any guns" in the vehicle. McCrary was not in custody

and the questions came only a few minutes into the stop while Officer Bassler was waiting for McCrary to find a picture of his driver's license.

McCrary argued that the interaction became "custodial" and that he should have received a *Miranda* warning before being asked whether there was a gun in the vehicle due to the duration of the encounter. We find the Magistrate Judge's rejection of this argument sound. This traffic stop ceased to be a brief traffic stop as a result of information obtained during the interaction between Officer Bassler and McCrary and later from the police computer system which then permissibly broadened the inquiry. The passage of time alone does not *ipso facto* transform a stop into a custodial interrogation. In any event, McCrary's statement that a firearm was in the vehicle's glove compartment was made in the very first minutes of the stop. As noted by the Magistrate Judge, there were no other indicia of custody. McCrary stayed in his car throughout the questioning, he was never placed in handcuffs, Officer Bassler was the only officer present and he was courteous to McCrary during the inquiry. The Court agrees that the questioning in the first minutes of the stop did not exceed the bounds of *Terry* to transform the encounter into a custodial interrogation. McCrary's objection on this point is overruled.

### C.  Seizure of the Firearm

The Magistrate Judge found that the information possessed by Officer Bassler provided reasonable suspicion that criminal activity was afoot and that he was justified in removing the firearm from the vehicle glove compartment for his safety. This Court agrees that McCrary's behavior while pulling over followed by untruthful explanations about what he was doing made Officer Bassler reasonably suspicious of some sort of criminal activity. Therefore, after determining that it was safest for McCrary to remain in the vehicle due to heavy, fast-moving

8

traffic on the highway, Officer Bassler was not required to leave the firearm in the vehicle and accessible by the occupant. He told McCrary he was going to leave him in the vehicle and remove the firearm. McCrary responded "OK." DN 28-1, 7:30-7:45.

McCrary's objection to the Magistrate Judge's conclusions in this regard focuses on McCrary's behavior during the stop, noting that nothing in McCrary's demeanor would have put Officer Bassler on his guard that McCrary posed a threat. McCrary was pleasant and smiling, and answered questions "Yes, sir." He did not appear agitated, act aggressively, or make any furtive gestures. McCrary contends that because of his pleasant nature and cooperative demeanor, Bassler's retrieval of the firearm was unjustified. However, his assertion that Officer Bassler could not have had an objectively reasonable belief that McCrary was "potentially dangerous" is belied by the fact that Officer Bassler observed movement consistent with the concealment of something in the passenger compartment, made all the more suspicious by untruthful answers provided by McCrary when questioned about what he was doing. McCrary eventually admitted that there was a gun in the vehicle but claimed that it belonged to his girlfriend. He had no further information about the gun. McCrary also admitted to having a prior firearms charge, had no license in his possession, gave a different address from that on record, and was driving someone else's vehicle with an expired registration and no proof of insurance. Regardless of McCrary's pleasant and unthreatening demeanor during the encounter, Officer Bassler clearly had sufficient information to form an articulable, objectively reasonable suspicion that McCrary was potentially dangerous. It was therefore permissible for him to remove the firearm from the glove compartment in the vehicle in which McCrary remained sitting and investigate further. Officer Bassler apparently reached this very conclusion as he told McCrary that he was going to remove the firearm for "safety" and to "make sure everything is

9

on the up-and-up." McCrary's assertion that the retrieval of the firearm was an unjustified search is rejected and his objection to the Magistrate Judge's Report on this basis is overruled.

### D. Towing of the Vehicle

The Magistrate Judge concluded that because, when stopped, McCrary could not produce a driver's license, proof of insurance, or a current vehicle registration for the vehicle he was operating, Officer Bassler was justified in towing the vehicle as a matter of public safety, citing *Bybee v. City of Paducah*, 46 Fed.App'x 735, 737 (6th Cir. 2002). DN 46, p. 12, PageID #233. Additionally, the Magistrate Judge noted the USDOJ *Investigation of the Louisville Metro Police Department and Louisville Metro Government* but concluded that it did not compel a finding that the stop and citation in this case were infirm. DN 46, p. 11, PageID #222.

In his objections to the Magistrate Judge's Report, McCrary points out that the *Bybee* case cited by the Magistrate Judge was decided in 2002. He does not suggest, however, that the case is not good law in the Sixth Circuit. McCrary also notes that Bassler testified that in his approximately 7,000 traffic stops, he could not recall another case where he had towed a vehicle for speeding, no license, and no proof of insurance. DN 51, p. 11, PageID #318. Neither of these points establishes that the towing of the vehicle was improper in this instance. Authority from the Sixth Circuit supports the impoundment of the vehicle under the "community caretaking functions" and "in the interests of public safety." *Bybee, supra.* at 737, quoting *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (quoting *Cardy v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). McCrary's contention that the towing of the vehicle was improper is without merit.

McCrary urged in his post-hearing brief that any argument by the United States that the firearm would inevitably have been discovered in the vehicle should be rejected because impounding the vehicle was improper. He reiterates this argument in his objections to the Magistrate Judge's Report. The Magistrate Judge did not address the United States' alternate argument of inevitable discovery, concluding instead that there was nothing improper about the traffic stop and recommending that the motion to suppress be denied on that basis. DN 46, p. 12, PageID #223. However, to the extent that McCrary's argument is based upon a purported lack of authority to impound the vehicle, we have determined that there was nothing improper about Officer Bassler's decision to have the vehicle towed. Therefore, McCrary's objection is overruled.

### III. Supplemental Findings of Fact and Conclusions of Law

McCrary raises an argument which was presented in his post-hearing brief but not developed by the parties. It was thus not addressed by the Magistrate Judge. He now develops this argument in his objections. As we have the record before us and the United States has provided the legal framework for the evaluation, we will address McCrary's argument.

McCrary takes issue with the third round of questioning about the firearm which occurred over thirty minutes into the stop:

> Later in the stop, after Bassler had a conversation with ATF Agent Mike Alvey about whether Mr. McCrary had possessed the gun and what he could charge him with, Bassler returned to Mr. McCrary and asked him where the gun was when he put it in the glove box. The purpose of this question was to establish knowledge and possession of the gun. Yet, Mr. McCrary was not mirandized.

11

DN 51, p. 5, PageID #312. The United States did not respond specifically to this argument which was developed only in McCrary's objections to the Magistrate Judge's Report. The United States did, however, discuss traffic stops and the contours of a detainee's right to a *Miranda* warning in its post-hearing brief:

> As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *United States v. Johnson*, 242 F. 3d 707, 709 (6th Cir. 2001). *See also United States v. Garrido*, 467 F.3d 971, 977–78 (6th Cir. 2006). Generally, the Supreme Court has held that roadside questioning of a motorist is not considered a "custodial interrogation" for purposes of invoking *Miranda*. *See Berkemer v. McCarty,* 468 U.S. 420 (1984). "[T]he usual traffic stop is more analogous to a so-called 'Terry stop,' see *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest." *Berkemer* at 439.
>
> "Two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely,' *Miranda v. Arizona*, 384 U.S., at 467, 86 S.Ct., at 1624. First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." *Id.* at 437. That being the case, a traffic stop typically entails tasks such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (citing *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979)). *See also United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022). "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Berkemer* at 438. Additionally, "[t]he Sixth Circuit has developed four factors for use when determining whether an interview was custodial: (1) the location of the interview; (2) the length and manner of questioning; (3) whether the suspect possessed unrestrained freedom of movement during the interview; and (4) whether the suspect was told that he need not answer the questions." *United States v. Slone*, No. CRIM. 12-5-ART-(4), 2013 WL 3799419, at *4 (E.D. Ky. July 19, 2013) (citing *United States v. Panak,* 552 F.3d 462, 465 (6th Cir.2009)).

DN 41, pp. 3-4, Page ID #s 194-195.

The Court has already found the Magistrate Judge's conclusions sound with respect to the initial stop and questioning leading up to and including the retrieval of the firearm from the vehicle's glove compartment. But the encounter between McCrary and Officer Bassler was far

from over after the officer returned to his cruiser with the firearm. McCrary was left sitting in the vehicle on the side of the highway for his safety[6] for over thirty minutes, complying with the instruction of Officer Bassler to remain there. The "presumptively brief" traffic stop[7] became a circumstance where McCrary was "completely at the mercy of police"[8] when the interaction progressed beyond the bounds of permissible inquiries related to the stop.

The United States contends that McCrary was never "in custody" because (1) he was not placed "under arrest," (2) he was told when he was removed from the vehicle that he was not "in custody" but was "detained," and (3) he was told he was "not going to jail today." McCrary was issued a citation and was allowed, eventually, to leave in the company of individuals he was permitted to call. His use of his phone was not restricted by Officer Bassler. However, the *Slone* factors require the Court to consider the location of the interview, the length and manner of questioning, whether the suspect possessed unrestrained freedom of movement during the interview, and whether the suspect was told he need not answer the questions posed to him.[9] For the reasons set forth below, we find that the statements made by McCrary during the third series of questions posed by Officer Bassler must be suppressed. The circumstances under which the questioning occurred are problematic under the *Slone* factors.[10] The following series of events

---

[6] Before removing the firearm from the glove compartment, Officer Bassler stated to McCrary, "You're still sitting in the car. Everything's fine. I'm gonna leave you in the car. It's safer." *Id.*, 7:30-7:45.
[7] *Miranda*, 384 U.S. at 437.
[8] *Berkemer*, 468 U.S. at 438.
[9] *Slone*, 2013 WL 3799419 at *4.
[10] McCrary complains of other actions by the officers on the scene such as asking him to remove his hat and asking him what name he is known by on the street. These actions were purportedly taken in connection with another investigation involving McCrary that was ongoing. We do not address these actions or the circumstances of the stop beyond the point at which McCrary was asked to exit the vehicle. Those matters have no bearing on this prosecution in which McCrary is charged with being a felon in possession of a firearm. The third questioning of McCrary lasted only a minute and thus did not impermissibly prolong the stop. The further delay after McCrary exited the vehicle was the result of the process of towing the vehicle which has already been found to be permissible.

was discussed only generally by the Magistrate Judge. The bodycam video beginning approximately 20 minutes into the stop documents what occurred (DN 28-1):[11]

      Officer Bassler returned to his cruiser with the firearm. He obtained information that McCrary was a felon and contacted an agent, Mike Alvey, with the Department of Alcohol, Tobacco, Firearms and Explosives ("ATF") about the stop and his seizure of a firearm from a then-identified felon. This communication occurred approximately 24 minutes into the stop.[12] Officer Bassler informed the agent that McCrary was a felon, that he stated that the gun belonged to his girlfriend and that McCrary was the only person in the vehicle. The agent told Bassler "If you saw him physically put his hand on it, its possession." Bassler then told the agent that he did not see him physically put hands on the firearm; rather, he saw him "leaning over putting everything in the floorboard and glove box as he was being pulled over." He further noted that the firearm was not on the driver's side of the vehicle but rather was on the passenger side "in the glove box by the time I got to the window." The agent then stated "…can you articulate enough what you saw to make it his…" It was clear from his comment to Agent Alvey that Officer Bassler understood that felons were prohibited from possessing firearms. He remarked "You can't have guns dude; you can't touch 'em; you can't move 'em."

      At 31 ½ minutes into the stop, very shortly after the conversation with the ATF agent ceased, Officer Bassler approached the vehicle and again questioned McCrary about the firearm. He said "Reality, OK? Where was the gun when you picked it up and put it in the glove box?...Where was it?" McCrary responded "in here" and pointed to the center console next to him. The officer said "In the center console?" McCrary responded "Yes, sir." Bassler then said

---

[11] These facts supplement the Findings of Fact in the Magistrate Judge's Report.
[12] The conversation concerning McCrary and the firearm lasted about six to seven minutes before Officer Bassler approached the vehicle for the third time. DN 28, 23:45-31:00.

14

"And you grabbed it and put it in the glove box?" McCrary responded "Yes, sir." Officer Bassler said "I appreciate your honesty…You know you are a convicted felon." McCrary nodded affirmatively. He stated "You know you can't be around guns." McCrary nodded affirmatively. "You know you can't touch them, possess them, have them, OK." McCrary responded "Yes, sir." Officer Bassler then told him that he was not going to "lock him up today," that he was "getting a ticket and I'm taking the gun. And it is what it is." McCrary responded "Yes, sir." Then Bassler told McCrary to "Hop out [of the vehicle]. I'm not going to place you in custody, but understand clearly you're detained."[13]

Thus, after learning in a discussion with an ATF agent that the information he possessed at that point was not certain proof of McCrary's possession of the firearm, Officer Bassler sought admissions from McCrary that the firearm was within his reach, that he touched and moved the firearm to the glove compartment, and that he knew he was a felon and prohibited from possessing firearms. Immediately after obtaining the admissions, Officer Bassler removed McCrary from the vehicle, reiterated he was not "in custody" but informed him that he was "detained."

This Court is not troubled by the initial questioning of McCrary, for all the reasons stated in the Magistrate Judge's Report and in this Memorandum Opinion. We find, however, that the situation is far different with respect to the incriminating admissions deliberately elicited from him during a third encounter which occurred over thirty minutes into the stop.

When we consider all of the *Slone* factors, we find that this third vehicle-side questioning of McCrary was a custodial interview for this very brief period of questioning. He was required to remain in the vehicle. He was questioned for a third time over thirty minutes after the

---

[13] This occurs 32 minutes and 25 seconds into the stop.

initiation of the stop. The additional questions asked by Officer Bassler of McCrary was for the sole purpose of eliciting of incriminating information. The tone of the third encounter was different from the initial inquiries. Officer Bassler asked questions for the purpose of eliciting incriminating responses. Bassler went so far as to make statements rather than asking questions at some points, seeking an affirmation from McCrary. At no time did Officer Bassler inform McCrary he need not answer the questions. There was no other reason for this exchange with McCrary other than shoring up a less-than-perfect basis for a felon in possession charge.

As noted by McCrary, "'Interrogation,' in the *Miranda* context, encompasses 'any words or actions on the part of the police…that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" DN 51, p. 6, Page ID #313, quoting *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013)(quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The bodycam footage establishes that Officer Bassler knew that he was eliciting incriminating responses from McCrary through his third series of questions and statements. McCrary was subjected in this third encounter to a custodial interrogation for which he should have received a *Miranda* warning. It does not matter that this encounter lasted only a minute and that he was promptly removed from the vehicle and told that he was not "in custody." The critical minute of non-Mirandized custodial interrogation deliberately yielded incriminating responses from McCrary which cannot be permitted to be used against him in this prosecution.

For the reasons stated herein, McCrary's motion to suppress statements will be granted in part to the extent that McCrary's responses to the third set of questions and statements posed to him will be suppressed. In all other respects, the motion will be denied.

Motion having been made and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that:

1. Defendant La'Quel McCrary's objections to the Report and Recommendation of the United States Magistrate Judge (DN 51) are **GRANTED IN PART AND DENIED IN PART AS STATED BELOW.**

2. The Report and Recommendation of the United States Magistrate Judge (DN 46) is **ACCEPTED AND ADOPTED IN FULL WITH THE EXCEPTION OF THE FOLLOWING CHANGES TO THE TEXT:**

    a. Page 1 (PageID #212), 4th line, the word "his" is **DELETED** and **REPLACED** with the word "a".

    b. Page 8 (PageID #219), 7th line, the words "confessed to having a firearm" are **DELETED** and **REPLACED** with "stated that there was a firearm in the vehicle."

    c. Page 11 (PageID #222), 7th line, the word "knew" is **DELETED** and **REPLACED** with "believed".

    d. Page 11 (PageID #222), the words "admitted to putting a gun there" are **DELETED** and **REPLACED** with "admitted that there was a gun in the vehicle and that it was in the glove compartment."

    **AND**

    **WITH THE FURTHER EXPLANATION THAT THE COURT ACCEPTS THE RECOMMENDATION THAT THE MOTION TO SUPPRESS BE DENIED WITH RESPECT TO THE MATTERS ADDRESSED BY THE REPORT.**

3. This Memorandum Opinion and Order Supplements the Magistrate Judge's Report and Recommendation and shall be considered together with that Report for all further purposes herein.

4. For the reasons stated hereinabove, the motion of Defendant La"Quel McCrary to suppress evidence (DN 23) is **GRANTED IN PART AND DENIED IN PART,** in accordance with this Memorandum Opinion and Order.

5. The Court **ORDERS** that the statements and/or affirmations of Defendant La'quel McCrary concerning (1) his knowledge of the prohibition on his possession of firearms, (2) knowledge of his status as a felon, and (3) the initial location and movement of the firearm seized from the vehicle, all which were made in response to the questions and/or statements of Officer Bassler, are **SUPPRESSED.** The statement by McCrary that a firearm was in the vehicle in the glove box and the firearm itself are not suppressed for the reasons stated in the Magistrate Judge's Report.

**IT IS SO ORDERED.**

August 30, 2023

Charles R. Simpson III, Senior Judge
United States District Court